# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

ANTONIO A. ADAMS, *#360-152, #1006918*,   *

Plaintiff                                 *

v                                         *         Civil Action No. JKB-19-2204

WEXFORD HEALTH SOURCES, INC.,             *
RICHARD SAMPONG, *PA*,
MOHAMMAD SALEEM, *MD*,                    *
MARYANNE REIMER, *NP*,
DARRYL HILL, *MD*, and                    *
MOFIKPARA WRIGHT, *MD*,
                                          *
Defendants
                                      ***
## MEMORANDUM OPINION

Self-represented Plaintiff Antonio A. Adams, an inmate at Jessup Correctional Institution in Jessup, Maryland ("JCI"), filed the above-captioned 42 U.S.C. § 1983 civil rights action against medical staff at JCI, alleging that Wexford Health Sources, Inc. ("Wexford"), Richard Sampong, Mohammad Saleem, Maryanne Reimer, Darryl Hill, and Mofikpara Wright (collectively, the "Wexford Defendants")[1] failed to timely provide medication or treatment for the pain and discomfort associated with the swelling of his right testicle. ECF No. 1. He seeks monetary damages and injunctive relief. *Id.* at 5.

On October 18, 2019, the Wexford Defendants filed a Motion to Dismiss, or in the Alternative, Motion for Summary Judgment. ECF No. 28. On November 8, 2019, the Corizon Defendants similarly filed a Motion to Dismiss or Alternatively for Summary Judgment. ECF No.

---

[1] Wexford was the contracted medical provider for inmates in the Maryland Department of Public Safety and Correctional Services until December 31, 2018. Beginning January 1, 2019, Corizon Health replaced Wexford, and Defendants Hill and Wright continue to provide medical services on behalf of Corizon. Thus, to the extent Plaintiff raises claims regarding events that took place after January 1, 2019, his claims are against Hill and Wright (collectively, the "Corizon Defendants").

30. Plaintiff opposed both motions. ECF Nos. 32, 41. Thereafter, Plaintiff moved for appointment of counsel and filed a self-titled Motion to Request Extension for Certificate of Qualified Expert and Report. ECF Nos. 48, 49.

This Court deems a hearing unnecessary. *See* Local Rule 105.6 (D.Md. 2016). For the reasons set forth below, Defendants' motions, construed as motions for summary judgment, shall be granted. Plaintiff's Motion to Appoint Counsel shall be denied and his Motion to Request Extension for Certificate of Qualified Expert and Report shall be dismissed.

## Background

### I.     Plaintiff's Allegations

Plaintiff claims that on June 29, 2016, he complained to Richard Sampong, PA about his right testicle. Complaint at 2, ECF No. 1. Upon examination, Sampong noted that it was the size of a baseball, but he did not prescribe any pain medication. *Id.*

On July 12, 2016, Plaintiff saw Mohammad Saleem, M.D., who diagnosed him with having benign fluid in his testicle. *Id.* Dr. Saleem then ordered an ultrasound which, on September 1, 2016, revealed a cystic mass. *Id.* At the time of the ultrasound, both of Plaintiff's testicles were swollen. *Id.* According to Plaintiff, the medical staff did not provide pain medication or scrotal support. *Id.*

On September 2, 2016, Plaintiff had a follow-up visit with a nurse who scheduled a provider visit in seven days. *Id.* at 3. Plaintiff states, however, that he did not see a provider until September 20, 2016, when Maryanne Reimer, a nurse practitioner, evaluated his condition. *Id.* At that time, Plaintiff stated that he suffered from pain and discomfort in his testicles, yet Reimer did not provide the requested scrotal support. *Id.* Plaintiff saw Reimer again on October 12, 2016, at which time Plaintiff told her that he could not sleep or get dressed due to his testicles. *Id.* Reimer

2

did not provide any medication or scrotal support during that visit.  *Id.*

On November 22, 2016, Plaintiff saw Dr. Saleem.  *Id.*  Although Plaintiff was told to take medication for pain, no medication was prescribed.  *Id.*  In addition, Plaintiff was directed to elevate his scrotum with a towel inside his boxer shorts, but the towel did not stay in place.  *Id.*  He was not given scrotal support.  *Id.*

Despite being scheduled for a follow-up visit seven days from November 22, 2016, Plaintiff did not see a medical provider until December 12, 2017, when he had a visit with Lori Slavick for a periodic physical exam.  *Id.*  Plaintiff then had a follow-up visit with Bernard Alenda, NP on March 26, 2018, for his swollen testicles.  *Id.* at 4.  Plaintiff's condition was considered to be a chronic problem at that time, but he was still not provided any medication or scrotal support.  *Id.*

On June 28, 2018, scrotal support was ordered for Plaintiff, but pain medication was not prescribed.  *Id.*  On July 23, 2018, Plaintiff complained that the scrotal support was too small.  *Id.*  Although he was told that a bigger size would be ordered, Plaintiff did not receive new scrotal support or any pain medication.  *Id.*

On February 23, 2019, Plaintiff told Darryl Hill, M.D. that he was in severe pain due to his testicles, which at that time were two to three times bigger and heavier.  *Id.*  Plaintiff stated that he was having difficulty urinating, but no lab tests were ordered, nor was he referred to a urologist.  *Id.*  Plaintiff alleges that as of May 13, 2019, Mofikpara Wright, M.D. acknowledged that Plaintiff has suffered for over three years.  *Id.*  However, Plaintiff still has not received medication, proper scrotal support, orders for blood and urine tests, or a consultation with a urologist.  *Id.*

In sum, Plaintiff claims that Defendants have been deliberately indifferent to his serious medical needs, they have denied him proper medical care, and they have been negligent in treating

his condition.

## II.     Defendants' Response

In support of their motions, Defendants have submitted copies of Plaintiff's medical records for the three years preceding the filing of the Complaint. At the time the medical condition at issue arose, Plaintiff was incarcerated at the Maryland Correctional Institution in Hagerstown, Maryland ("MCI-H").

On June 23, 2016, Plaintiff submitted a sick call slip complaining that his right testicle was swollen, but he reported that it did not hurt. Wexford Medical Records at 2, ECF No. 28-4. The Wexford Defendants acknowledge that Plaintiff saw Sampong on June 29, 2016, at which time Plaintiff's right testicle was assessed as the size of a baseball. *Id.* at 3. Sampong noted that Plaintiff denied any testicular pain. *Id.* On July 1, 2016, Sampong submitted a request to have Dr. Saleem, the onsite surgeon, evaluate Plaintiff. *Id.* at 5.

During Plaintiff's visit with Dr. Saleem on July 12, 2016, Plaintiff reported no pain, injury, or surgery on the scrotum. *Id.* at 6. He was assessed as having a soft cystic swelling in the right side of his scrotum surrounding the right testis. *Id.* Dr. Saleem noted that the right testis was not palpable, and the left testis was normal in size and without a mass. *Id.* Dr. Saleem advised Plaintiff that there was benign fluid surrounding the right testis and that an ultrasound would be scheduled to rule out any malignancy. *Id.*

On July 20, 2016, Plaintiff was approved for an ultrasound. *Id.* at 7. On August 2, 2016, Plaintiff submitted a sick call slip to renew his medications, but he did not indicate that he was in pain. *Id.* at 8. On August 8, 2016, Plaintiff refused to go for an ultrasound because it was too hot.[2]

---

[2] In his Complaint, Plaintiff states that he did not refuse but asked to go to a closer hospital. ECF No. 1 at 2.

4

*Id.* at 9-10.  The following day, Plaintiff was seen by Dr. Saleem, who advised him to have the ultrasound to facilitate diagnosis and treatment.  *Id.* at 11.  During a visit with Reimer on August 16, 2016, Plaintiff stated that he was ready to have the ultrasound.  *Id.* at 12.

On September 1, 2016, Plaintiff underwent an ultrasound at Bon Secours Hospital to evaluate a cystic mass on the right testicle for possible malignancy.  *Id.* at 13.  The impression was bilateral hydroceles[3] in his scrotum, the right larger than the left.  *Id.*  There was no evidence of solid mass lesion or intrinsic testicular pathology, or vascular compromise.  *Id.*

The following day, Plaintiff was seen by a nurse at MCI-H who noted that the discharge paperwork from Bon Secours contained no new orders.  *Id.* at 15.  Plaintiff was referred to a provider for follow up within seven days.  *Id.*  On September 20, 2016, Plaintiff was seen by Reimer at chronic care clinic, at which time his ultrasound results were reviewed, and he was referred to Dr. Saleem for next steps.  *Id.* at 16.  Plaintiff stated that the masses were very uncomfortable and asked whether a scrotal support would help.  *Id.*  Upon physical examination, he was in no apparent distress.  *Id.*

On October 8, 2016, Plaintiff submitted a sick call slip to renew his antacid prescription.  *Id.* at 19.  Pain in his scrotum or testicles was not reported.  *See id.*  During a visit with Reimer on October 12, 2016, Plaintiff complained that the hydroceles interfered with walking, sleeping, and getting dressed.  *Id.* at 20.

---

[3] Dr. Hill explains that a hydrocele is "a type of benign scrotal mass or swelling in the scrotum that occurs when fluid collects in the thin sheath surrounding a testicle."  Hill Decl. at ¶7, ECF No. 30-3.  According to Dr. Hill, a hydrocele can develop due to inflammation or injury within the scrotum, or due to infection, including a sexually transmitted infection.  *Id.*  It is not usually painful or harmful and may not need any treatment.  *Id.*  The principal symptom is "a painless swelling of one or both testicles, and there may be discomfort from the heaviness of a swollen scrotum."  *Id.*  If there is associated pain, it may increase with the size of the inflammation.  *Id.*

Plaintiff saw Dr. Saleem on November 22, 2016. *Id.* at 21. Dr. Saleem noted that Plaintiff's ultrasound result did not reveal any solid masses, and he advised Plaintiff that no surgery was indicated unless the testicles became infected or other complications arose. *Id.* Plaintiff was advised to elevate the scrotum with a towel in his boxers and, if there was pain, to lie down and take pain medication. *Id.*

On December 15, 2016, March 20, 2017, June 7, 2017, August 28, 2017, and November 19, 2017,[4] Plaintiff was seen by several providers for chronic care clinic. *Id.* at 22-34. During all five visits, Plaintiff's exams were unremarkable, and no pain in his scrotum or testicles was noted. *Id.* In addition, during the latter four visits, Plaintiff denied any dysuria (painful urination) or hematuria (blood in the urine). *Id.* at 27-34.

On December 7, 2017, Plaintiff's vitals were taken for his annual physical. *Id.* at 35-36. No pain in his scrotum or testicles was noted. *Id.* On December 12, 2017, Plaintiff was seen by Lori Slavick, P.A. for his annual physical exam, which was unremarkable. *Id.* at 37-39. Plaintiff was noted to have an active hydrocele, but he was in no apparent distress, he did not complain of pain in his scrotum or testicles, and he denied any dysuria or hematuria. *Id.*

On January 12, 2018, Plaintiff was seen at a provider sick call to follow up on his blood pressure. *Id.* at 40-41. He was in no apparent distress and no pain in his scrotum or testicles was noted. *Id.*

On February 20, 2018, approximately three weeks after being transferred to JCI, Plaintiff was seen at a provider sick call with complaints that he had not received his medication for other pre-existing conditions. *Id.* at 42. He had no other medical concerns. *Id.* On February 28, 2018,

---

[4] Plaintiff was transferred to the Maryland Correctional Training Center in Hagerstown, Maryland prior to the November visit. *See* ECF No. 28-4 at 32.

6

Plaintiff submitted a sick call slip to renew medications. *Id.* at 43. No pain in his scrotum or testicles was reported. *See id.*

On March 22, 2018, Plaintiff submitted a sick call slip complaining of his swollen testicles. *Id.* at 44. On March 26, 2018, Plaintiff was seen for medication refill, at which time he complained that he needed to be seen in chronic care for his swollen testicles and sleep apnea. *Id.* at 45-46. Plaintiff's exam was unremarkable, he was in no apparent distress, and no pain in his scrotum or testicles was noted. *Id.*

On June 12, 2018, Plaintiff submitted a sick call slip complaining he needed a chronic care clinic appointment for his swollen hydrocele. *Id.* at 47. On June 28, 2018, Plaintiff was seen at a provider sick call, during which time a request was placed for chronic care evaluation within one week. *Id.* at 48. Plaintiff's history of swollen hydroceles was reviewed, and scrotal support was ordered. *Id.*

On July 5, 2018, Plaintiff received scrotal support. *Id*. at 49. On July 23, 2018, he was seen in chronic care clinic, during which time Plaintiff complained that the scrotal support he received was too small. *Id.* at 50-53. The director of nursing was informed to order a larger size. *Id.* On exam, Plaintiff was in no acute distress, and no pain in his scrotum or testicles was noted. *Id.*

On August 6, 2018, Plaintiff declined his dietary physical. *Id.* at 54. On August 26, 2018, Plaintiff submitted a sick call for medication refills, but he did not indicate that he had pain in his scrotum or testicles. *Id.* at 55.

On February 23, 2019, Plaintiff saw Dr. Hill in chronic care clinic. *Id.* at 56-57. Plaintiff complained that his right testicle had been increasing in size for over a year and that it was now more difficult to urinate. *Id.* Plaintiff denied chest pain, shortness of breath, fever, or bleeding,

and stated that he wanted the testicle removed. *Id.* On exam, Plaintiff was noted to have an enlarged right testicle. *Id.* He did not complain of pain in his testicles, nor did he request another scrotal support. Hill Decl. at ¶6, ECF No. 30-3. Dr. Hill submitted a consultation request for Plaintiff to have a testicular ultrasound to confirm the hydrocele. Corizon Medical Records at 4-5, ECF No. 30-4.

On May 13, 2019, Plaintiff saw Dr. Wright during a chronic care visit. *Id.* at 6-7. Dr. Wright noted that Plaintiff complained of worsening painful scrotal swelling, with an increase in the size of the swelling over the last two to three months. *Id.* He also noted Plaintiff's complaint of a weak urinary stream, with hesitancy on urination, but no dysuria, hematuria, fever, or chills. *Id.* Dr. Wright observed a large hydrocele on the right side and a moderate hydrocele on the left. *Id.* at 7. He submitted a consultation request for Plaintiff to see a urologist for further workup and evaluation, and Flomax was started for Plaintiff's urinary retention. *Id.* at 7-9.

On July 23, 2019, Plaintiff had a consultation with urologist Dr. Laurence Scipio at Bon Secours Hospital, at which time Plaintiff reported that hydroceles had been present for four years, but the painful swelling had increased over the past three to four months. *Id.* at 10-11. Plaintiff also stated that he was taking Flomax and hydrochlorothiazide (HCTZ).[5] *Id.* Dr. Scipio noted that Plaintiff was morbidly obese but in no distress. *Id.* at 11. Upon examination, Plaintiff's scrotum was enlarged but no significant tenderness was noted. *Id.* An ultrasound confirmed the presence of bilateral hydroceles, larger on the right, with no evidence of any solid mass lesion or intrinsic testicular pathology, or vascular compromise. *Id.* Dr. Scipio requested a repeat scrotal ultrasound and authorization for a right hydrocelectomy. *Id.* He planned to follow up with a left

---

[5] HCTZ is a water pill used to treat fluid retention (edema) and high blood pressure (hypertension). *See* https://www.drugs.com/hctz.html (last visited Aug. 25, 2020).

hydrocelectomy approximately six to eight weeks after the initial surgery depending on the post-surgical process.  *Id.*

On August 12, 2019, requests for a urology consultation and additional scrotal ultrasound were submitted per Dr. Scipio's instructions.  *Id.* at 14-17.  On August 22, 2019, Plaintiff saw Dr. Wright again for a chronic care visit.  *Id.* at 18-19.  Dr. Wright noted Plaintiff had seen Dr. Scipio, and that Plaintiff complained of scrotal pain and heaviness for more than three months, with no penile discharge, burning sensation on urination, dysuria, fever, or chills.  *Id.*  Plaintiff was in no apparent distress, though lower edema was present.  *Id.*  Dr. Wright renewed Flomax and ordered lab work.  *Id.*

On August 28, 2019, Dr. Scipio performed the right hydrocelectomy surgery, and no complications were noted.  *Id.* at 20.  The following day, Plaintiff was admitted into the JCI infirmary.  *Id.* at 21-23.  It was noted that Plaintiff tolerated the surgery well but continued to have some bleeding from the operative site, though the bleeding was controlled and a drain was in place. *Id.*

On August 30, 2019, Plaintiff reported that his hydrocele had significantly decreased in size since the surgery, and he denied scrotal tenderness, fever, chills, pain with urination, blood in urine, or difficulty with urination.  *Id.* at 24.  Plaintiff did not report any pain.  *Id.*  He was told to refrain from heavy lifting for about six weeks and to continue antibiotics and pain medications as ordered.  *Id.*  Plaintiff was also instructed to leave the drain in place, and a request for follow-up was submitted to General Surgery.  *Id.* at 26-27.

On September 3, 2019, Plaintiff reported that the drain became dislodged on its own, but he denied pain, fever, chills, difficulty with urination, or blood in his urine.  *Id.* at 28.  Plaintiff had no medical complaints and wanted to return to his cell.  *Id.*  The medical staff noted decreasing

9

right scrotal edema and assessed an acute, improving hydrocele post-right hydrocelectomy.  *Id.* Plaintiff was scheduled to be discharged back to JCI to follow up with a provider within two days. *Id.*  It was also noted that Dr. Scipio wanted to see Plaintiff in his office within about two weeks, and a consultation request was submitted to that effect.  *Id.* at 30-31.

On September 6, 2019, Plaintiff saw Dr. Wright for a provider visit.  *Id.* at 32-33.  Plaintiff complained of minimal drainage from the surgical site and requested gauze, which he was given. *Id.* at 32, 34.  Dr. Wright instructed Plaintiff to continue Keflex and Tylenol medications, and to follow up with urology in two weeks.  *Id.*

According to Defendants, Plaintiff continues to be seen regularly at the chronic care clinic, as well as by Dr. Scipio.  ECF No. 30-3 at ¶18.

## Plaintiff's Motions

Plaintiff has filed a Motion to Appoint Counsel.  ECF No. 48.  The Court may, pursuant to 28 U.S.C. § 1915(e)(1), appoint an attorney to represent any person proceeding in forma pauperis who is "unable to afford counsel."  There is no absolute right to appointment of counsel.  *See Miller v. Simmons*, 814 F.2d 962, 966 (4th Cir. 1987).  Rather, a federal district court judge's power to appoint counsel under 28 U.S.C. § 1915(e)(1), is a discretionary one, and may be considered where an indigent claimant presents exceptional circumstances.  *See Cook v. Bounds*, 518 F.2d 779 (4th Cir. 1975); *see also Branch v. Cole*, 686 F.2d 264 (5th Cir. 1982).  The question of whether such circumstances exist in a particular case hinges on the characteristics of the claim and the litigant.  *See Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984).  Where a colorable claim exists but the litigant has no capacity to present it, counsel should be appointed.  *Id*.

In support of his motion, Plaintiff claims that he is unable to afford counsel, the issues in this case are complex, he has extremely limited access to the law library and limited knowledge of

the law, he needs assistance in securing an expert witness, and he has been unable to retain private counsel. ECF No. 48. After reviewing Plaintiff's numerous filings in this case, the Court finds that he has adequately presented his claims, and his case need not proceed to discovery or a hearing. For these reasons, appointment of counsel is not warranted.

Also pending is Plaintiff's Motion to Request Extension for Certificate of Qualified Expert and Report. ECF No. 49. Upon review of this filing, it appears that Plaintiff intended to submit his request to the Health Care Alternative Resolution Office and not to this Court. Therefore, the motion shall be dismissed.

**Standard of Review**

Defendants' motions are styled as motions to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. Motions styled in this manner implicate the Court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Adams Hous., LLC v. The City of Salisbury, Maryland*, 672 F. App'x. 220, 222 (4th Cir. 2016) (per curiam). But, when the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does

not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

Here, Defendants filed motions titled as motions to dismiss or alternatively for summary judgment and submitted additional materials in support. Plaintiff also filed exhibits in support of his claims. Therefore, Plaintiff was on notice that the Court could treat Defendants' motions as ones for summary judgment and rule on that basis. Accordingly, the Court will review Plaintiff's claims under the Rule 56(a) standard.

Rule 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247-48 (emphasis in original). The Court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (per curiam) (citation and quotation omitted), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. NC. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015). At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).

**Discussion**

**I.     Eighth Amendment Claim**

Defendants assert that Plaintiff's claims must be dismissed because the Complaint is insufficient on its face. Wexford Motion at 9, ECF No. 28-3; Corizon Motion at 9-10, ECF No. 30-1. Alternatively, Defendants contend that they are entitled to summary judgment because there is no evidence of deliberate indifference to Plaintiff's medical needs. ECF No. 28-3 at 15-18; ECF No. 30-1 at 10-13. The Wexford Defendants also assert that the doctrine of respondeat superior is not recognized in § 1983 claims, Plaintiff's claims of medical negligence are not judicially actionable, and Plaintiff is not entitled to injunctive relief. ECF No. 28-3 at 13-14, 18-20. As previously explained, the Court will construe Defendants' motions as motions for summary judgment.

Plaintiff's claims, brought pursuant to 42 U.S.C. § 1983, are based on his Eighth Amendment right to be free from cruel and unusual punishment. To sustain an Eighth Amendment claim for denial of adequate medical care, a plaintiff must demonstrate that the defendant's acts or omissions amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).

Objectively, the medical condition at issue must be serious. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). A medical condition is serious when it is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241 (citation omitted).

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer v. Brennan*, 511 U.S. 825, 839-40 (1994). "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997); *see also Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "[I]t is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Jackson*, 775 F.3d at 178 (citations omitted). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *See Farmer*, 511 U.S. at 844. "[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Jackson*, 775 F.3d at 178. Thus, "[d]eliberate indifference is more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (citation and internal quotation marks omitted).

Under this standard, a mere disagreement between an inmate and a physician over the appropriate level of care does not establish an Eighth Amendment violation absent exceptional circumstances. *Id.* Further, the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable*." *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir. 1977) (emphasis added).

Here, Plaintiff's claims center on Defendants' alleged misdiagnosis of his hydrocele, failure to provide pain medication and scrotal support, and delay in providing medical care. ECF No. 1 at 2-5. In addition, Plaintiff claims that Defendants were medically negligent. *Id.*

Based on the record, it appears that Plaintiff was routinely seen and treated by the medical staff at MCI-H, MCTC, and JCI to address his chronic issue with his testicles. After Plaintiff first voiced his complaint on June 29, 2016, he was seen by Dr. Saleem within two weeks. Although Plaintiff contends that Dr. Saleem's initial diagnosis of "benign fluid" was incorrect, Dr. Saleem acted appropriately by recommending an ultrasound in order to reach the correct diagnosis. Once the ultrasound revealed bilateral hydroceles in September 2016, Dr. Saleem reviewed the results and noted that surgery was not necessary unless the testicles became infected or other complications arose, as there was no evidence of solid mass lesion or intrinsic testicular pathology, or vascular compromise. Contrary to Plaintiff's allegation that he did not see a provider from November 22, 2016 to December 12, 2017, the medical records indicate that he was seen by several providers for chronic care clinic during that period, at which time no complaints of pain in his scrotum or testicles were noted, and Plaintiff denied any painful urination or blood in his urine.

Plaintiff did not submit a sick call slip regarding his testicles until March 22, 2018, and a physical exam four days later revealed that he was in no apparent distress and did not complain of pain. Plaintiff submitted another sick call slip on June 12, 2018, and was scheduled for chronic care clinic to evaluate his condition. Scrotal support was provided, although it was later discovered to be too small.

Plaintiff reported difficulty urinating in February 2019, but complaints of pain were not noted. Nonetheless, an ultrasound was ordered to evaluate the hydrocele. On May 13, 2019, upon Plaintiff's first complaint of worsening pain, he was promptly referred to Dr. Scipio, a urologist who subsequently recommended surgery. On August 28, 2019, Dr. Scipio performed the right hydrocelectomy surgery with no complications. Plaintiff completed his recovery at JCI and was scheduled for a follow-up with Dr. Scipio.

Viewing the evidence in the light most favorable to Plaintiff, the Court cannot find that Defendants were deliberately indifferent to Plaintiff's needs. Even assuming that, objectively, Plaintiff was suffering from a serious medical condition, Defendants were not subjectively reckless in treating it. Defendants continuously evaluated Plaintiff's condition from 2016 to 2019 through the sick call process, chronic care and provider visits, ultrasounds, and by referral to a urologist. Pain medication was not prescribed because no complaints of pain were noted during his visits. Moreover, Dr. Saleem's decision not to recommend surgery following the first ultrasound did not amount to an act or omission "for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. As previously indicated, "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir.1970)). Nor does Plaintiff claim that any delay in receiving surgery exposed him to a serious or significant injury. Accordingly, any such delay "does not violate the Eighth Amendment where the seriousness of the injury is not apparent." *Brown v. Comm'r of Cecil Cty. Jail*, 501 F. Supp. 1124, 1126 (D. Md. 1980).

In his response to Defendants' motions, Plaintiff claims that he repeatedly complained of testicular pain. Plaintiff, however, has marshalled no evidence to support this unverified assertion. Therefore, he has not shown that Defendants exhibited a callous disregard for his serious medical need, *see Estelle*, 429 U.S. at 105-06, and Defendants are entitled to summary judgment on this claim.

## II. Respondeat Superior

Plaintiff makes no direct allegations against Wexford. Instead, it appears that he seeks to hold Wexford liable for the actions of its employees. It is well established, however, that the

doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (holding that there is no respondeat superior liability under § 1983). Rather, liability of supervisory officials is "premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). To establish supervisory liability under § 1983, a plaintiff must show that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted). "A single act or isolated incidents are normally insufficient to establish supervisory inaction upon which to predicate § 1983 liability." *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983) (footnote and citations omitted).

Plaintiff has failed to plead or demonstrate sufficient facts showing supervisory indifference to, or tacit authorization of, any misconduct by Wexford's employees. As discussed above, Plaintiff failed to show that his Eighth Amendment rights were violated in connection with his medical care. Accordingly, he has necessarily failed to demonstrate that Wexford authorized or was indifferent to any such violation. Plaintiff's assertions do not demonstrate any pattern of widespread abuse necessary to establish supervisory action or inaction giving rise to § 1983 liability. *See id.* ("Generally, a failure to supervise gives rise to § 1983 liability, however, only in

those situations in which there is a history of widespread abuse."). Therefore, Wexford is entitled to summary judgment on this ground as well.

### III. Negligence Claims

To the extent that Plaintiff also brings medical negligence claims, the Court declines to exercise supplemental jurisdiction over them. *See* 28 U.S.C. § 1367(c) (stating that a district court "may decline to exercise supplemental jurisdiction over a claim . . . [if] the district court has dismissed all claims over which it has original jurisdiction."). "When, as here, the federal claim is dismissed early in the case, the federal courts are inclined to dismiss the state law claims without prejudice rather than retain supplemental jurisdiction." *Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726-27 (1966)). These claims are dismissed without prejudice.[6]

### IV. Injunctive Relief

Plaintiff's request for injunctive relief is also denied. A preliminary injunction is an extraordinary and drastic remedy. *See Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). A party seeking a preliminary injunction bears the burden of demonstrating: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) why the injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *The Real Truth About Obama, Inc. v. Federal Election Comm'n*, 575 F.3d 342, 346-47 (4th Cir. 2009). As to irreparable harm, the movant must show the harm to be "neither remote nor speculative, but actual and

---

[6] To sustain a medical malpractice claim in state court, Plaintiff must adhere to the Maryland Health Care Malpractice Claims Act, Md. Code Ann., Cts. & Jud. Proc. § 3-2A-01, *et seq.*, which requires a plaintiff to file medical negligence claims with the Health Care Alternative Dispute Resolution Office prior to filing suit when the claim for damages exceeds the jurisdictional amount for the state district courts. *See id.* at § 3-2A-02; *see also Roberts v. Suburban Hosp. Assoc., Inc.*, 73 Md. App. 1, 3 (1987).

imminent." *Direx Israel, Ltd. v. Breakthrough Med. Group*, 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted). In the prison context, courts should grant preliminary injunctive relief involving the management of correctional institutions only under exceptional and compelling circumstances. *See Taylor v. Freeman*, 34 F.3d 266, 269 (4th Cir. 1994).

As previously discussed, Plaintiff has failed to demonstrate the likelihood of success on the merits and for this reason alone his request for injunctive relief fails. Moreover, Plaintiff has not demonstrated that he is likely to suffer irreparable harm or that the balance of equities tips in his favor. Thus, his request for injunctive relief is denied.

## Conclusion

Defendants' motions, construed as motions for summary judgment, are granted. Plaintiff's Motion to Appoint Counsel is denied, and his Motion for Certificate of Qualified Expert and Report is dismissed.

A separate Order follows.

Dated this 27 day of August, 2020.

FOR THE COURT:

James K. Bredar
Chief Judge